IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY OPHELIA COUSART, | ) | CASE NO. 4:11CV796 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Kimberly Ophelia Cousart ("Cousart"), seeks judicial review of the final decision of Defendant, Commissioner of Social Security, ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the final decision of the Commissioner should be AFFIRMED.

## I.  Procedural History

Cousart filed an application for SSI on October 21, 2008 for a broken right hip, alleging an onset date of August 17, 2008.  Tr. 26, 107, 140.  The state agency denied Cousart's claim initially on December 24, 2008 (Tr. 10) and upon reconsideration on April 9, 2009.  Tr. 10.  On December 30, 2009, a hearing was held before Administrative Law Judge John J. Porter (the "ALJ").  Tr. 21-48.  In a decision dated April 13, 2010, the ALJ determined that Cousart was not disabled.  Tr. 10-20.  Cousart requested review of this decision by the Appeals Council and on April 4, 2011, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

**II.  Evidence**

**A.**       **Personal Evidence**

Cousart was born on July 2, 1965, and was forty-four (44) years old at the time of the ALJ's decision.  Tr. 16, 107.  She attended high school into twelfth grade, but did not graduate. Tr. 25.  She has no past relevant work experience.  Tr. 15.

**B.**       **Medical Evidence**

On August 18, 2008, Cousart underwent surgery to repair a right intertrochanteric hip fracture.  Tr. 207-08.  On August 21, 2008, she was discharged to home with home care for physical therapy.  Tr. 196.  On September 2, 2008, Cousart was able to perform touch down weight bearing and she noted improvement in her pain.  Tr. 204.

On September 9, 2008, Cousart went to the emergency room complaining of right leg pain.  Tr. 224-27.  The attending nurse observed that Cousart ambulated without a limp or problem.  Tr. 226.  She left the hospital without being formally discharged.  Tr. 227.

On September 30, 2008, James N. Pantelakis, M.D., Cousart's orthopedic surgeon, reported that x-rays showed good position of surgical components with moderate healing.  Tr. 203.  Cousart continued to complain of pain and sensitivity over her upper thigh and hip region, although Dr. Pantelakis observed no signs of any abnormality.  Tr. 203.  Dr. Pantelakis advised her to continue outpatient physical therapy and to follow-up with him in six to eight weeks.  Tr. 203.  On December 2, 2008, Dr. Pantelakis reported that x-rays showed complete healing of Cousart's right intertroch fracture.  Tr. 238.  Cousart was neurovascularly intact, she had no pain in her right hip with internal or external rotation, and her incision was well-healed with no calf tenderness.  Tr. 238.  She had a slight Trendelenburg gait (an abnormal gait caused by weakness

of the abductor muscles).  Tr. 238.  Dr. Pantelakis advised Cousart to continue her physical therapy and to return to him for follow-up in three months.  Tr. 238.

Cousart underwent eighteen physical therapy sessions from October 13, 2008 to December 21, 2008.  Tr. 237.  Her physical therapist reported that she met all of her goals including improved flexibility of her right thigh and range of motion of her right knee, increased strength to 4/5 in her right hip, and decreased pain level with all movement.  Tr. 237.  The physical therapist reported that Cousart had normal heel-toe progression of her right leg with no assistive device.  Tr. 237.

On February 24, 2009, Dr. Pantelakis reported that Cousart was using a quad cane (a walking cane with four points of floor contact) and was doing well.  Tr. 236.  Cousart had no pain with internal and external rotation of her right hip but she had some mild tight sensitivity over the anterior lateral thigh.  Tr. 236.  Cousart had no calf tenderness and her leg lengths were equal.  Tr. 236.  X-rays showed a good position of surgical components with no signs of loosening and a completely healed intertrochanteric fracture.  Tr. 236.  Dr. Pantelakis advised Cousart to resume full activity level, to continue physical therapy for strengthening, and to follow up with him in three months.  Tr. 236.

On March 11, 2009, Cousart was discharged from her second round of physical therapy sessions because she had met all of her goals.  Tr. 235.  Upon her discharge from physical therapy, Cousart noted a decreased pain level from 8/10 to 3/10.  Tr. 235.  The physical therapist reported that the flexibility of Cousart's right thigh had increased to "good +," and the range of motion of her right knee was within normal limits.  Tr. 235.  The strength of Cousart's right knee had increased to 4+/5, and the strength of her right hip had increased to 5/5 for all ranges.  Tr.

235. Cousart's physical therapist reported that she had a normal heel-toe progression of her right leg with no assistive device.  Tr. 235.

On April 24, 2009, Dr. Pantelakis reported that Cousart's ambulation continued to improve, and she was now walking without an assistive device.  Tr. 299.  Her gait was mildly antalgic and she complained of sensitivity over her hip.  Tr. 299.  Dr. Pantelakis speculated that the internal hardware might be irritating Cousart.  Tr. 299.  Dr. Pantelakis explained to Cousart that removing her internal hardware was not an option because it put her at risk for refracturing her hip.  Tr. 299.  Cousart requested additional pain medication, and Dr. Pantelakis gave her the benefit of the doubt "for the last time" and wrote her a prescription.  Tr. 299. Dr. Pantelakis noted that Cousart was not a reliable patient.  Tr. 299.

On June 10, 2009, Cousart's physical therapist reported that Cousart had attended ten out of twelve scheduled physical therapy sessions from March 26, 2009 to May 27, 2009.  Tr. 283.  Cousart met her physical therapy goal, which was to be able to walk without a quad cane.  Tr. 283.  Upon her discharge from physical therapy, Cousart displayed normal/independent gait mechanics of her right leg with no assistive device.  Tr. 283.  The physical therapist noted that Cousart was able to walk for fifteen minutes on a treadmill at speeds of two to two-and- one-half miles per hour with normal gait mechanics of her right leg.  Tr. 283.

On August 18, 2009, Cousart complained to Dr. Pantelakis of pain in her right hip.  Tr. 298.  She also complained of her right hip giving out.  Tr. 298.  On physical examination, Cousart was neurovascularly intact and her leg lengths were equal.  Tr. 298.  She had moderate to severe pain with internal and external rotation of her right hip.  Tr. 298.  X-rays showed complete healing and no hardware complications.  Tr. 298.  Dr. Pantelakis opined that Cousart's

4

symptoms were out of proportion to the objective medical findings.  Tr. 298.  He recommended that she get a second opinion from another physician.  Tr. 298.

On September 3, 2009, Cousart underwent a consultation with Dr. Brendan Patterson for a second opinion.  Tr. 285-86.  On physical examination, Cousart walked with a mildly antalgic gait.  Tr. 285.  Motor and sensory examinations were distally intact, and x-rays demonstrated a well-healed fracture.  Tr. 285-86.  Dr. Patterson opined that Cousart's pain was likely related to some irritation from the metal plate in her hip.  Tr. 286.  However, Dr. Patterson noted that Cousart had no tenderness to log rolling of the right hip, exhibited only mild resistance to rotation of the hip with flexion, and had intact motor and sensory functions.  Tr. 285.  Dr. Patterson recommended against removal of the metal plate from Cousart's hip due to concerns regarding refracture.  Tr. 286.  He advised Cousart to continue with her activities as tolerated and recommended that she take Tylenol for her pain.  Tr. 286.

## C.    Testimonial Evidence

### 1.    Cousart's Testimony

On December 30, 2009, Cousart appeared with counsel and testified at the administrative hearing.  Tr. 21-48.  She testified that she was only able to sit for a period of fifteen to twenty minutes.  Tr. 28.  After that time, Cousart stated that she would experience a shooting pain in her right leg from her buttock to the top of her knee.  Tr. 29-31.  Cousart testified that she is able to stand for ten minutes before she experiences the same type of pain.  Tr. 31.

Cousart testified that her mother and sister take her to the grocery store where she will walk around with her cane and shop for her own items.  Tr. 35.  She stated that, in a typical week, she will prepare her own meals and clean her one-bedroom apartment.  Tr. 36.  Cousart testified that she does a little bit at a time and she sits down if she gets tired.  Tr. 36.

Contrary to the report of her physical therapist, Cousart testified that she walked on the treadmill without using her cane for five minutes, not fifteen.  Tr. 27-28.  She brought her cane with her to physical therapy but was not allowed to use it during therapy.  Tr. 27.

She stated that she used a walker right after surgery until about February or March, 2009.  Tr. 39.  She then progressed to using a quad cane.  Tr. 39-40.  Cousart testified that, since her surgery, she has not been able to walk around without the use of either a walker or cane.  Tr. 40-41.  However, Cousart further testified that she sometimes walks around her apartment without using her cane.  Tr. 41.  Occasionally, her right leg gives out on her and causes her to stumble, but not fall.  Tr. 41.

### 2.    Vocational Expert's Testimony

Mr. Sterosta, a vocational expert ("VE"), also testified at the hearing.  Tr. 43-48.  The ALJ asked the VE to assume a hypothetical individual who was limited to sedentary work that allowed the individual to get up every thirty minutes and move about for two or three minutes in addition to the customary fifteen minute morning break and half hour afternoon break.  Tr. 43-44.  When the individual needs to move about, she uses a one-hand assistive device. Tr. 43.  The individual would also be limited to simple, routine, repetitive work not performed in a fast-paced production environment with relatively few workplace changes.  Tr. 43-44.  In response, the VE testified that employers generally will tolerate an individual being off-task for four minutes per hour and that being off-task between four and six minutes is a gray area, i.e., some employers will tolerate it but others will not.  Tr. 44.  Assuming that the individual would be off-task no more than six minutes per hour, the VE testified that the individual would be capable of performing over one million jobs in the national economy, as a surveillance system monitor, a call out operator, or an assembler.  Tr. 44-45.  The VE further testified that the use of an assistive

device and the fact that the hypothetical individual had no past relevant work history would not affect the type or number of jobs available.  Tr. 46-47.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

In his April 2010 decision, the ALJ found that Cousart had not engaged in substantial gainful activity since October 21, 2008, the application date.  Tr. 12.  The ALJ determined that Cousart had the following severe impairments: left intertroch fracture; status post right hip fracture; and fixation surgery.  Tr. 12.  The ALJ found that Cousart did not have an impairment or combination of impairments that met or medically equaled a Listing.[1]  Tr. 12.  The ALJ next determined that Cousart had the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a) (lifting no more than 10 pounds; sitting with occasional walking and standing) except that "the claimant would need to get up every 30 minutes and move about for two minutes; would require a one hand assistive device when moving about; and is limited to simple, routine, and repetitive work not performed in a fast-paced production environment with relatively few work place changes."  Tr. 13.  The ALJ then determined that Cousart had no past relevant work history.  Tr. 15-16.  Finally, considering her vocational factors, RFC, and the evidence from the

---

[1] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

VE, the ALJ found that Cousart was capable of performing work that existed in significant numbers in the national economy.  Tr. 16.  Thus, the ALJ concluded that Cousart was not disabled.  Tr. 16-17.

## V.  Arguments of the Parties

Cousart objects to the ALJ's decision on three grounds.  First, she asserts that the ALJ erred in finding her impairments did not meet or equal a Listing Impairment.  Second, Cousart objects to the ALJ's conclusion that her complaints of debilitating pain were not fully credible.  Third, Cousart claims that that the VE's testimony in response to a hypothetical question did not accurately reflect Cousart's functional limitations.

In response, the Commissioner argues that the ALJ reasonably found that Cousart was not disabled.  The Commissioner contends that substantial evidence supports the ALJ's determination that Cousart did not meet or equal a Listing Impairment.  The Commissioner also argues that the ALJ properly evaluated the credibility of Cousart's complaints of debilitating pain in light of the entire record.  Finally, the Commissioner asserts that the ALJ's determination that Cousart was capable of engaging in substantially gainful activity is supported by the VE's testimony.

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.     **Substantial Evidence Supports the ALJ's Determination that Cousart did not Meet or Equal Listing 1.03.**

Cousart contends that the ALJ erred under Step Three in finding that her impairments did not meet or equal Listing 1.03.  Doc. 12, pp. 4, 8.  For a claimant to show that her impairment matches an impairment in the Listings, she must meet all of the specified medical criteria; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  In this case, substantial evidence supports the ALJ's conclusion that Cousart does not have an impairment or combination of impairments that meets or medically equals Listing 1.03.

Cousart argues that her musculoskeletal impairment meets all of the required criteria under Listing 1.03.  Listing 1.03 requires:

> Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.03.  The inability to ambulate effectively is defined in Listing 1.00B2b(1) as follows:

> [The] inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 1.00B2b(1).  The Listing further describes what it means to ambulate effectively:

> [I]ndividuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 1.00B2b(2).

After thoroughly considering the record, the ALJ found that Cousart's impairments did not meet the severity of Listing 1.03.  Tr. 12-15.[2]  The ALJ also correctly noted that no treating or examining physician had found that Cousart met or equaled Listing 1.03.  Tr. 12.  On review of the record, the ALJ's conclusion is supported by substantial evidence.

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that she is disabled at Step Three.  *See* 20 C.F.R. § 404 .1520; *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986).  Here, there is no evidence of an inability to ambulate effectively as required by Listing 1.03.  In order to constitute ineffective ambulation under Listing 1.00B2b(1), the use of an assistive device must "limit[] the functioning of both upper extremities."  Cousart essentially argues that her use of a quad cane demonstrates

---

[2] The ALJ incorporated his discussion of the medical evidence from his RFC finding into his finding that Cousart does not have an impairment or combination of impairments that meets or medically equals a Listing.

an inability to ambulate effectively.  Even assuming that Cousart did use a quad cane most, if not all, of the time, this device does not limit the functioning of *both* of her upper extremities, which is a requirement under the Listing.  Accordingly, Cousart would not meet Listing 1.03 based on her use of a quad cane.

Moreover, the medical evidence does not support Cousart's claim that she relied on the use of a quad cane to ambulate or that she had an inability to ambulate effectively.  On April 24, 2009, Dr. Pantelakis reported that Cousart's ambulation continued to improve and that she was walking without an assistive device.  Tr. 299.  In addition, in numerous physical therapy notes, Cousart continued to make a positive progression to meet the long term goals of her physical therapy.  Tr. 219-21, 235, 237, 239, 258-65, 278-80, 282-83.  For example, on December 26, 2008, Cousart was discharged after ten weeks of physical therapy for obtaining five out of five long term goals: decreased pain level to 0-3/10; increased flexibility to Good+; increased strength of right hip to 4/5 and knee to 4+/5; normal heel-toe progression with no assistive device.  Tr. 260.  On January 23, 2009, Cousart's physical therapist reported that Cousart came to her two physical therapy appointments that week without an assistive device.  Tr. 261.  During Cousart's physical therapy sessions from March 26, 2009 to May 27, 2009, she met her long term goal to be able to walk without a cane.  Tr. 279-283.  According to the physical therapy reports, during these visits, Cousart was able to walk on a treadmill up to 15 minutes at 2 to 2.5 mph and lift 75lbs on a leg press.  Tr. 280, 282-83.  This evidence establishes that Cousart was capable of ambulating effectively.

Cousart's ability to ambulate effectively is also confirmed by her testimony.  When asked by the ALJ about shopping for groceries, Cousart stated that she walks around the store with her cane and gets her own groceries.  Tr. 35, 40.  Cousart is capable of cooking for herself and riding

the bus.  Tr. 36-37.  Also, Cousart lives in an upstairs apartment requiring her to climb steps.  Tr. 41.  This evidence further establishes that Cousart was capable of ambulating effectively.

Overall, there is substantial evidence in the record that Cousart was able to ambulate effectively, as defined by the regulations.  As such, Cousart failed to establish that she met all of the criteria for Listing 1.03.  Accordingly, substantial evidence supports the ALJ's finding that Cousart was not disabled at Step Three of the sequential evaluation process.

## B.  Substantial Evidence Supports the ALJ's Credibility Determination

Cousart asserts that the ALJ erred in finding her testimony was not entirely credible.  Doc. 12, pp. 4-8.  She argues that the proffered reasons given by the ALJ were insufficient to reject her testimony and subjective complaints of disabling pain.  This argument is without merit.

A disability claim can be supported by a claimant's subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 475.  "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken."  *Id.* (citing 20 C.F.R. § 404.1529(c)(3)).  To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used.  20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id.*  The ALJ should consider the following factors in evaluating a claimant's symptoms:

1) the individual's daily activities;
2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) factors that precipitate and aggravate the symptoms;
4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones,* 336 F.3d at 476 (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers,* 486 F.3d at 247.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec.,* 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *2.

Here, the ALJ undertook the appropriate analysis and determined that Cousart's statements about her limitations lacked credibility.  Tr. 13-15.  In reaching this determination, the

ALJ provided several reasons for discounting Cousart's credibility, including her positive response to physical therapy, her report of symptoms that were inconsistent with medical evidence and course of treatment, her lack of work history which shows a lack of motivation to work, and her wide array of activities of daily living. Tr. 13-15. *See* SSR 96-7p, 1996 WL 374186, at *3 (credibility analysis should include consideration of, among other things, the objective medical record, the claimant's daily activities, the effectiveness of medication, and treatment received). The ALJ thoroughly discussed the medical records in arriving at an RFC that discounted Cousart's testimony. None of Cousart's treating physicians or physical therapists found extensive medical problems such that Cousart could not perform any work whatsoever. The ALJ considered this evidence in making his overall decision as to Cousart's ability to do the physical demands of work and reasonably inferred that her pain and limitations are not as disabling as she alleged.

As noted by the ALJ, Cousart underwent successful hip surgery, and her medical records showed consistent improvement thereafter. Tr. 13. Less than four months after her surgery, on December 2, 2008, x-rays showed complete healing of Cousart's hip fracture. Tr. 238. Although she was still relying on a quad cane on February 24, 2009 (Tr. 236), by April 24, 2009, Dr. Pantelakis reported that she was able to walk without an assistive device with only a mildly antalgic gait. Tr. 299. Cousart complained of continued pain in her right hip to Dr. Pantelakis and requested additional pain medication. Tr. 299. Dr. Pantelakis questioned Cousart's motives for requesting additional pain medication, stated that she was "not a reliable patient," and noted that he was giving her the benefit of the doubt "for the last time" in writing her a prescription for pain medication. Tr. 299. On June 10, 2009, Cousart's physical therapist reported that she was able to walk without a cane and had completed fifteen minutes on a treadmill at speeds of two to

two-and-one-half miles per hour with normal gait mechanics of her right leg.  Tr. 283.  On

August 18, 2009, Dr. Pantelakis opined that Plaintiff's symptoms were out of proportion to the

objective medical findings and he recommended examination by another physician.  Tr. 298.  On

September 3, 2009, Dr. Patterson reported similarly benign physical findings, noting that Cousart

had no tenderness to log rolling of her right hip, exhibited only mild resistance to rotation of her

hip with flexion, and had intact motor and sensory function.  Tr. 286.  He prescribed only

conservative treatment with Tylenol for Cousart's pain.  Tr. 286.

In sum, the objective medical evidence shows that Cousart's right hip fracture fully

healed without complications, that she made significant progress in physical therapy, and that

she was able to walk without an assistive device.[3]  Accordingly, substantial evidence supports

the ALJ's finding that Cousart's subjective complaints of disabling symptoms were not fully

credible.

## C.      The VE's Testimony Accurately Reflects Cousart's Functional Limitations

Cousart asserts that the VE's testimony did not accurately reflect her functional

limitations because the ALJ elicited flawed testimony from the VE at the administrative hearing.

Doc. 12, pp. 8-9.  She argues that the limitations posed in the ALJ's first hypothetical would

prevent her from obtaining employment.  This argument is without merit.

At Step Five of the sequential analysis, the ALJ must determine whether, in light of the

claimant's residual functional capacity, age, education, and past work experience, the claimant

can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4).  The burden shifts to the

Commissioner at Step Five to prove the existence of a significant number of jobs in the national

economy that a person with the claimant's limitations could perform.  *See, e.g., Her v. Comm'r of*

---

[3]  The ALJ also noted that Cousart's lack of significant work experience raised questions about her motivation to
work in general.  Tr. 15.

*Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999). In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. *Ealy v. Comm'r of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010). However, it is well settled that hypothetical questions need only incorporate those limitations that the ALJ has accepted as credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Infantado v. Astrue*, 263 Fed. App'x. 469, 477 (6th Cir. 2008).

Here, the ALJ presented a hypothetical to the VE that included all of the limitations provided for in the ALJ's RFC finding. Tr. 45-47. The ALJ found that Cousart has the RFC to perform sedentary work with the exception that she would need to get up every 30 minutes and move about for 2 minutes; would require a one hand assistive device when moving about; and is limited to simple, routine, and repetitive work not performed in a fast-paced production environment with relatively few work place changes. Tr. 13. Cousart's testimony concerning her symptoms was inconsistent with medical evaluations, successful physical therapy, and questionable motivation to work. Tr. 13-15. With regard to her physical impairments, records from her treating physicians and physical therapists showed that physical therapy was successful in rehabilitating her so that she was able to ambulate effectively, walk without the use of an assistive device, and required no more than Tylenol for pain. Tr.219-221, 235, 237-239, 258-265, 278-280, 282-286, 298-301. Furthermore, Cousart testified that she was able to perform activities of daily living (feeding herself, caring for herself, caring for her house, shopping for groceries, riding the bus, spending time with others, taking medication without reminders, following written and spoken instructions), which establishes that she was not as limited as she claimed. Tr. 15, 35-37, 40-41. The ALJ accounted for all of Cousart's credible limitations from

her left intertroch fracture and post right hip fracture and fixation surgery by limiting the range of sedentary work Cousart could perform.

Cousart challenges the first hypothetical because the ALJ framed the off- task time required by Cousart in the range of two to three minutes per half hour.  Tr. 43-44.  The VE testified that six minutes per hour (three minutes per half hour) was a threshold for off-task time that would be tolerated by most employers.  Tr. 44.  The ALJ modified the hypothetical to two minutes per half hour (four minutes per hour) and the VE then testified that over one million jobs exist in the national economy that a person with such limitations could perform.  Tr. 44-45.  A person with Cousart's personal and vocational characteristics and RFC could perform work as an alarm monitor (350,000 jobs nationally), call out operator (600,000 jobs nationally), and a wide number of assembler positions (200,000 jobs nationally).  Tr. 43-44.  In his findings, the ALJ limited Cousart's RFC to moving about for two minutes every 30 minutes.  Tr. 13.  An ALJ need not include limitations that are not supported by the evidence or are not credible.  *See Casey*, 987 F.2d at 1235.  Therefore, the ALJ did not err and the VE's testimony -- given in response to a hypothetical that reasonably reflected all the limitations that the ALJ found valid and credible -- constituted substantial evidence capable of supporting the ALJ's Step Five finding.

**VII.  Conclusion and Recommendation**

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Kimberly Ophelia Cousart's application for SSI should be **AFFIRMED**.


Dated: May 2, 2012

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).